Robert L. Herbst (RH8851)
Spencer Freedman (SF1420)
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400

Rosalind Fink (RF2492)
BRILL & MEISEL
845 Third Avenue, 16th Floor
New York, NY 10022
(212) 753-5599

Attorneys for Plaintiff



ECF Case

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ADRIANNE CRONAS, on behalf of herself and
all similarly situated persons,

06 CV 15295 (UA)

                 Plaintiff,

COMPLAINT

      vs.

JURY TRIAL DEMANDED

WILLIS GROUP HOLDINGS, LTD., WILLIS OF
NORTH AMERICA INC., WILLIS OF NEW YORK,
WILLIS OF NEW JERSEY, WILLIS OF
MASSACHUSETTS,

                Defendants.
-------------------------------------------------------------X

I.    **INTRODUCTION**

    1.    Plaintiff, by her attorneys Beldock Levine & Hoffman LLP and Brill & Meisel,

brings this action on information and belief, challenging a pattern and practice of sex

discrimination and retaliation committed by Willis Group Holdings Ltd., its subsidiary Willis

North America, Inc. ("WNA") and WNA's subsidiaries and affiliates including but not limited to

Willis of New York, Inc. and Willis of New Jersey, Inc. and Willis of Massachusetts, Inc.

(hereinafter referred to collectively as "Willis"), against current and former female employees of WNA and its subsidiaries at the level of Assistant Vice President, Vice President, Senior Vice President, Executive Vice President, Regional Vice President, Director, Chief Operating Officer, and Chief Executive Officer (hereinafter referred to collectively as "officers") and other current and former employees of WNA and its subsidiaries eligible for such officer titles (hereinafter referred to as "officer-equivalents"). The violations are systemic in nature, and constitute a pattern and practice of conduct which for many years has permeated, and upon information and belief continues to permeate, Willis's operations. The employment policies and practices of Willis have the effect and have been undertaken with the purpose of denying promotional opportunities and equal compensation to qualified female employees in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e and the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Human Rights Laws of the State and City of New York, N.Y. Exec. Law §§ 290 et seq. and New York City Admin. Code § 8-107 et seq.

II.   JURISDICTION

2.    Plaintiff's class-wide and individual claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and under the Human Rights Laws of the State and City of New York, N.Y. Exec. Law §§ 290 et seq. and New York City Admin. Code § 8-107 et seq. This Court has jurisdiction over plaintiff's federal claims pursuant to 42 U.S.C. §2000e5(f), 28 U.S.C. §§ 1331 and 1343(a)(4), and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.    Venue is proper in this district pursuant to 28 U.S.C § 1391(b) & ( c). Willis of New York Inc.'s principal place of business is located in the Southern District of New York and

a substantial part of the unlawful acts set forth below occurred in this district.

      4.      Plaintiff may be deemed to have exhausted administrative remedies pursuant to 42 U.S.C. § 2000e5(f)(3).  There currently is a class action case pending in this Court entitled <u>Hnot and Scheller, et al. v. Willis Group Holdings Ltd., et al.</u>, 01-CV-6558 (GEL), in which Shelly Hnot and Heidi Scheller brought virtually identical claims as set forth in this action, on behalf of themselves and a class of Willis officers and officer-equivalents.  Prior to filing that action,  Hnot and Sheller received a Letter of Determination from the EEOC finding that Willis subjected them and similarly situated female employees to a pattern and practice of discrimination because of their sex; and they received a notice of their right to sue on behalf of those similarly situated female employees dated July 12, 2001, and timely filed this action.  Plaintiff is one of those similarly situated female employees and a member of the Rule 23(b)(2) class certified (and a member of the putative Rule 23(b)(3) class sought) in that case.  The specific allegations of Hnot and Scheller's EEOC charge, including allegations of the ongoing nature of defendants' unlawful acts, and the scope of the EEOC investigation, put defendants on notice of the issues raised in this complaint and gave defendants an opportunity to investigate and address those issues. As such, plaintiff may be deemed as a matter of law of having met her administrative exhaustion requirements pursuant to  42 U.S.C. § 2000e5(f)(3).

III.    <u>THE PARTIES</u>

      5.      Plaintiff Adrianne Cronas is a female resident of the State of New Jersey and was employed by Willis as a Vice President, Senior Vice President and Executive Vice President from September 1996 until June 2004.

6.      Defendant WNA is an insurance brokerage firm which employs approximately 5,500 persons in the United States either directly or through subsidiaries. The defendant also does business under the shorter name "Willis."

7.      WNA is a wholly-owned subsidiary of Defendant Willis Group Holdings Ltd., headquartered in London, England. In the fall of 1998, Willis Corroon PLC, the predecessor to Willis Group Holdings Ltd., was purchased by Trinity Holdings, a corporation which KKR formed and in which KKR was the majority shareholder. WNA was previously known as Willis Corroon of America.

8.      Defendant Willis New York is a wholly-owned subsidiary of Defendant Willis Group Holdings Ltd. It is one entity through which WNA operates in the state of New York.

9.      Defendant Willis New Jersey is a wholly-owned subsidiary of Defendant Willis Group Holdings Ltd. It is one entity through which WNA operates in the state of New Jersey.

10.     Defendant Willis Massachusetts is a wholly-owned subsidiary of Defendant Willis Group Holdings Ltd. It is one entity through which WNA operates in the state of Massachusetts.

11.     In the United States, Willis operates through various subsidiaries, such as Defendant "Willis of New York, Inc." in order to comply with state insurance regulations.

12.     Willis controls the actions of its subsidiaries through Regional Vice Presidents, Regional Executive Officers or Regional Directors supervising several separate offices and reporting to Willis' United States headquarters.

13.     The officers of individual subsidiaries such as Willis of New York, Inc. also hold positions in the regional organization of WNA. For example, during much of the time relevant to this complaint, the Regional Director (later called Regional Executive Officer) of Willis's

4

Northeast Region was John Kelly, who was simultaneously the National Risk Management

Solutions ("RMS") Director.  Kelly also served as CEO of Willis Corroon New York (now

known as Willis of New York, Inc.) until April 1999.

14.     The various subsidiaries and offices of Willis are centrally controlled by Willis

and operate as a single, integrated enterprise.  The collective unit is referred to herein as Willis or

WNA.  WNA is similarly controlled by Willis Group Holdings Ltd.

IV.   PRACTICES CHALLENGED

15.     At all times material herein, female officers and officer-equivalents were routinely

subjected to a pattern and practice of sex discrimination affecting the terms and conditions of

their employment at Willis.  These practices reflect that discrimination was the standard

operating procedure - the regular, rather than the unusual practice at Willis.  The practices served

to create a glass ceiling adversely affecting female employees at Willis.

16.     Upon information and belief, in or about September, 1997, Willis formed a

Diversity Committee to which  Joseph McSweeny ("McSweeny"), then Chief Operating Officer

of the Tri-State Region (comprised of New York, New Jersey, and Connecticut) was appointed.

McSweeny formed a subcommittee to which he appointed, inter alia, Henry "Hank" Ehrlich.  The

Diversity Committee was limited to investigating diversity issues regarding race and gender,

because, although discrimination based upon disability, religion, national origin, age, and marital

status were also "issues," they were not as "high profile," and would not be investigated or

explored.

17.     Upon information and belief, the Diversity Committee found that "diversity" is

close to non-existent at Willis and that there were only a handful of officers who are other than

5

Caucasian males. However, the Committee reported its findings, but offered no solutions. McSweeny ignored a recommendation that Willis retain a professional consultant, Meg Armstrong, who was experienced in diversity and employment practices.

18.     Upon information and belief, during a Committee luncheon held to consider the patent disparity in the workplace, Ehrlich stated that "the reason women can't get ahead in business is because they can't go out to dinner at night." Even though the existence of a glass ceiling had been confirmed, the Committee was disbanded. No actions were adopted or undertaken to remedy the situation.

19.     Willis supervisors above the level of Assistant through Executive Vice President, who were exclusively men, were entrusted with discretion in the discharge of their duties, which was unfettered, and has afforded them the opportunity to apply their own personal preferences and biases in making employment decisions. Collectively these decisions have comprised a practice which is excessively subjective and has no legitimate business justification. As a result, qualified female employees have been intentionally denied employment opportunities and benefits that were available to similarly situated male employees. Moreover, female employees have been adversely affected by these excessively subjective practices. Accordingly, the practices identified above are being challenged under systemic disparate treatment and disparate impact theories of discrimination.

i.     **Discrimination in Compensation**: At all times material herein, Willis had a pattern of paying female officers and officer-equivalents salaries which were substantially lower than the salaries paid to males performing similar work, with similar or lesser skills, and with similar or lesser experience. Moreover, Willis also had a pattern of manipulating bonus and

commission payments and the grant of stock options to give preferential treatment to males and to discriminate against females. The combined result was a significant disparity in the total compensation paid to females as compared to similarly situated males.

ii. **Discrimination in Assignments and Promotions**: At all times material herein, Willis has discriminated against female officers and officer-equivalents with respect to assignments and promotions in two ways:

a.   Willis has discriminated against female officers and officer-equivalents seeking positions involving either lateral moves or promotions by refusing to consider female candidates, by hiring males outside Willis rather than promoting qualified females from within, by employing excessively subjective decision-making criteria, and generally by awarding such positions to males with lesser qualifications than similarly situated women.

b.   Willis has discriminated against female officers and officer-equivalents by steering more business and assigning more profitable accounts to males and away from females. Thus, Willis has created an obstacle to females gaining the experience and prominence associated with these assignments which in turn has an adverse affect on both their future career paths and on their current income.

iii. **Discrimination in other terms and conditions of employment**: At all times material herein, Willis has discriminated against female officers and officer-equivalents with respect to their overall terms and conditions of employment.

a.   Willis has scrutinized the expenses incurred by females far more strictly than for males.

b.   Willis requires women to complete a greater volume of work and to work a greater number of hours than similarly situated males.

c.   Willis supervisors have subjected females to far greater scrutiny and harsher criticism than they have to similarly situated males.

iv.   **Retaliation**: Willis has retaliated against woman who complained either internally or externally about Willis's treatment of women employees by, inter alia, blocking their advancement and by terminating their employment, either explicitly or constructively.

## V.   CLASS ACTION ALLEGATIONS

20.   Plaintiff requests that the Court certify a a Rule 23(b)(3) class consisting of all current and former female officers or officer-equivalents employed by defendants at any time from 1998 to the time of trial and a rule (23)(b)(2) class consisting of all current and former female officers or officer-equivalents employed by defendants at any time from 2001 to the time of trial.[1]

21.   The action is properly maintainable as a class action under Rule 23(a) because the requirements of this Rule are met.

---

[1]On March 21, 2005, the Court in the Hnot v. Willis, et al., granted class certification only pursuant to Rule 23(b)(2) to a class of female officers and officer-equivalents, from 1998 to 2001, deferring certification under Rule 23(b)(3). Plaintiff is a member of the certified (b)(2) class which extends to 2001, but continued to be subjected to the challenged discriminatory practices after 2001. Plaintiff therefore alleges class claims on behalf of all female officers and officer-equivalents of defendants who were subjected to defendants' discriminatory practices up to the present time, seeking (b)(2) certification for such a class from 2001 to the time of trial and a (b)(3) certification from 1998 to the time of trial.

8

22.     The class members are sufficiently numerous as to make joinder of all members impracticable. Upon information and belief, Willis employs, and employed during the pertinent period, hundreds of female officers and officer-equivalents throughout the country.

23.     The claims alleged by plaintiff raise questions of law or fact common to the class. These common questions include:

    a.      whether Willis permitted and still permits managers excessive subjectivity in making promotion decisions;

    b.      whether Willis permitted and still permits managers excessive subjectivity in making compensation decisions;

    c.      whether this excessive subjectivity had and continues to have a disparate impact on female officers and officer-equivalents;

    d.      whether this excessive subjectivity represented and continues to represent a deliberate action by Willis to block promotion of female officers and officer-equivalents and compensate female officers and officer-equivalents less than similarly situated males;

    e.      whether Willis has discriminated and continues to discriminate against females in compensation, promotion, and other terms and conditions of employment in violation of Title VII and similar applicable state and city laws;

    f.      whether Willis has failed to take reasonable steps to prevent and correct discrimination against female officers and officer-equivalents on the basis of their sex; and

9

g.   whether Willis has retaliated against female officers and officer-

equivalents who have protested, disclosed, talked about or otherwise

opposed discrimination.

24.   The claims alleged on behalf of the plaintiff are typical of those of the class.  All

of the claims arise from Willis's policies and practices permitting excessively subjective

decision-making with respect to promotion opportunities and compensation, and permitting

senior management to subject female officers and officer-equivalents to a hostile work

environment.

25.   The class representative and counsel will adequately and fairly protect the

interests of the class.

26.   This action is properly maintained as a class action under Federal Rule of Civil

Procedure 23(b)(2) because the party opposing the class has acted o refused to act on grounds

generally applicable to the class, thereby making appropriate final injunctive relief and

corresponding declaratory relief with respect to the class as a whole.

27.   The class action is properly maintainable as a class action pursuant to Rule

23(b)(3) because the questions of law and fact common to members of the class predominate

over questions affecting only individual members and a class action is superior to other available

methods for the fair and efficient resolution of this controversy.

VI.   ALLEGATIONS OF PLAINTIFF CRONAS

28.   Cronas was hired in September 1996 as a Vice President to work in the New York

office to start an environmental insurance specialty practice at the Willis tri-state region.  She

was hired at a salary of $65,000.  She was to bring in new business and cross sell the existing

book of business.

29.    In or about 1997, with environmental business exceeding expectations, Willis

made the environmental practice a stand-alone department, with Cronas as its head.  She

continued to sell and grow the environmental practice.

30.    By 1998, the tri-state environmental practice, housed in the New York office,

was a thriving practice.  The New York CEO, John Kelley, took Cronas to a meeting of company

CEOs in Boston to explain how she and her department were so successful, and also appointed

Cronas to the management committee of the New York office.  Cronas was the only team leader

on the management committee who was female.

31.    Nevertheless, in 1998, Jeffrey Gardner was hired as a Senior Vice President and

Regional Environmental Practice Leader in New York over Cronas and replaced her on the

management committee.  Upon information and belief, Gardner had been an underwriter for an

insurance company and had no insurance brokerage background or experience.  Although

Gardner was now the leader of the Environmental Practice department, Cronas effectively

continued to run it and to produce approximately 80% of its business.  Cronas had not been

offered either the positions of Senior Vice President or Regional Environmental Practice Leader,

although she was more qualified for those positions than Gardner.

32.    Gardner determined what out-of-town meetings Cronas could attend, and Cronas

was frequently denied permission to attend such meetings, which among other things provided

opportunities for business development, while upon information and belief, many of the male

officers and team leaders were often out of the office on Fridays during the spring and summer

playing golf with clients.

33.     In or about early 1999, when Cronas threatened to quit, defendants made Cronas a Senior Vice President and the Manager of the New York Environmental Department, charged with developing business in the Tri-State area.  She also continued to serve as a significant source of support on environmental practice matters throughout the Northeast.

34.     As Senior Vice President and Manager of the New York Environmental Department, Cronas developed and produced business in New York, New Jersey, Pennsylvania, Massachusetts and New Hampshire.  Cronas worked directly with the local Willis brokers in those offices to develop and produce environmental business, and she also hired or trained a person in house in some of those offices to develop and produce environmental business.

35.     In or about late 1998 or early 1999, upon information and belief, Gardner and one or more male officers, team leaders and/or significant business producers received stock or stock options.  Cronas was not offered and did not receive stock or stock options and was not aware that any had been offered.

36.     In or about 1999, Gardner became head of defendants' National Environmental Practice.  Shortly thereafter, in or about 2000, Gardner resigned and was replaced by Kenneth Ayers, who took the position in or about November 2000.  Upon information and belief, Ayers was offered and received stock or stock options as part of his compensation package.

37.     In 1998, when Cronas was expanding the department, she posted the job of client service manager in house (within Willis).  A woman who had been with Willis more than 10 years at that time applied for the job.  She informed Cronas that although she handled most of the major accounts in her department, she had never received a promotion to Vice President.  She also informed Cronas that she had trained several young men in her department who were then

12

fast-tracked right over her, and that they had been given privileges such as attending golf outings, entertaining clients and going on renewal trips while she was doing the work on the accounts. Cronas hired her and after less than a year promoted her to Vice President, despite resistance from Willis.

38.    From 1999 to 2002, Cronas continued to grow the business of her department.  In 2001, the department produced more than $2.5 million in new business revenue.  Cronas was responsible for producing approximately 90% of that business.  In 2002, her department produced approximately $5.5 million in new business revenue.  Cronas was appointed an Executive Vice President in 2002.  During this period of time, and during other periods of her employment at Willis, Cronas was an exceptional producer of business.

39.    Cronas almost always encountered resistance when attempting to get raises for the women in her department, resistance which was absent when it came to raises for the men. Obtaining promotions for men was also easier than obtaining promotions for women.

40.    In 2002, when Cronas promoted her administrative assistant, who was dynamic and qualified, to the position of insurance technician, the CEO's assistant commented to Cronas that it was more than unusual for someone in the assistant's position to be promoted at all at Willis.

41.    It was an acceptable practice at Willis for some men to have personal assistants to help them deal with email.  Upon information and belief, none of the women officers had a personal assistant.

42.    Upon information and belief, during the entire time Cronas was employed by Willis, she made less in compensation than comparable male officers, team leaders and

exceptional producers of business.  Upon information and belief, Cronas was not offered stock and stock options that were offered to and received by comparable male officers, team leaders and exceptional producers of business and, when she was given stock or options, the amounts she received were, upon information and belief, lower than those given to comparable males.  For example, upon information and belief, male exceptional producers who qualified for the Exceptional Producers Council and who produced business in the previous fourth quarter were given 500 stock options every year from 2001 to 2003.  Cronas produced such business and qualified as a member of that Council every year during those years but did not receive the 500 stock options.

43.     In or about late 2002, Cronas requested a transfer to the Willis office in Philadelphia for financial reasons, as her husband had been out of work for a long time.  Gary Mathieson, who was now the New York CEO, told Cronas that he could not afford to lose her in New York, and said he would get her a raise.  Although Willis then had a hiring freeze and was not giving raises, Mathieson reported back to Cronas that he had secured for her a raise of $35,000 in her base salary.  When Cronas asked him how he was able to manage that, he replied in substance that when they had evaluated what Cronas made and compared it to her counterparts, there was room to give her a raise.

44.     In or about February 2004, Shelley Hnot was deposed in this case.  Hnot testified that Cronas told her that she was unhappy about Gardner's being hired over her head and that she was not given the position and the commensurate salary, and that Cronas felt that she was doing the work and Gardner was getting the credit.  Cronas was not aware of Hnot's deposition or the substance of her testimony at the time.

14

45.     In or about March 2004, Cronas was demoted and relieved of her management

duties.  She was removed as manager of the Environmental Practice department.

46.     In or about June 2004, Cronas was terminated.  She was replaced by a man who

had no environmental insurance or brokerage experience, at a salary of $250,000, far in excess of

Cronas's salary of $185,000.

47.     Upon information and belief, Cronas's demotion and termination were

discriminatory and retaliatory.

## CLASS CLAIMS

### CLASS-WIDE COUNT I

### Violation of Title VII - Disparate Impact

48.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

47.

49.     Willis has maintained a system for making promotion and compensation decisions

that is excessively subjective and which has a disparate impact on female officers and officer-

equivalents.

50.     The defendants' discriminatory practices described above have denied female

officers and officer-equivalents promotional opportunities and compensation to which they are

entitled, which has resulted in the loss of past and future wages and other job benefits for

Plaintiff and members of the class.

51.     These employment practices violated § 703 of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. §2000e-2.

## CLASS-WIDE COUNT II

### Violation of Title VII - Disparate Treatment

52.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 51.

53.     Willis has maintained a system for making promotion and compensation decisions that is excessively subjective and through which defendants discriminate against female officers and officer-equivalents by denying them the same opportunities for upward mobility and compensation afforded to similarly situated male employees.

54.     The defendants' discriminatory practices described above have denied female officers and officer-equivalents promotional opportunities and compensation to which they are entitled, which has resulted in economic loss, emotional distress and other harm for which they are entitled to compensation.

55.     Defendants have undertaken these discriminatory practices willfully or with reckless disregard for employees' rights protected under Title VII.

56.     These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

## CLASS-WIDE COUNT III

### Violation of Title VII -- Retaliation

57.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 56.

58.     Female officers and officer-equivalents opposed unlawful employment practices by informing Willis employees and managers that there were problems with unequal treatment of

16

female employees, and by filing charges of discrimination with the EEOC.  Such activities are

protected under § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3.

59.    Following such actions, employees have been demoted and terminated by Willis.

These actions constitute retaliation in violation of § 704(a) of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e-3.

60.    The defendants' discriminatory practices described above have caused employees

harm, including economic loss and emotional distress.

61.    Defendants have undertaken these discriminatory practices willfully or with

reckless disregard for employees' rights protected under Title VII.

62.    Accordingly, the defendants violated employees' rights protected by § 704 of Title

VII of the Civil Rights Act of 1964, as amended.

## CLASS-WIDE COUNT IV

### Violation of New York State and New York City Human Rights Statutes:
### Disparate Impact

63.    Plaintiff repeats and realleges the allegations contained in paragraphs 1

through 62.

64.    Willis has maintained a system for making promotion and compensation decisions

that is excessively subjective and which has a disparate impact on female officers.

65.    The defendants' discriminatory practices described above have denied female

officers and officer-equivalents promotional opportunities and compensation to which they are

entitled, which has resulted in the loss of past and future wages and other job benefits to

members of the class.

66.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for employees' rights protected under the New York State and City Human Rights Laws.

67.    These employment practices violate and N.Y. Exec. Law §§ 290 *et seq.* and New York City Admin. Code § 8-107 et seq.

## CLASS-WIDE COUNT V

### Violation of New York State and New York City Human Rights Statutes:
### Disparate Treatment

68.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 67.

69.    Willis has maintained a system for making promotion and compensation decisions that is excessively subjective and through which defendants discriminate against female officers by denying them the same opportunities for upward mobility and compensation afforded to similarly situated male employees.

70.    The defendants' discriminatory practices described above have denied female officers and officer-equivalents promotional opportunities and compensation to which they are entitled, which has resulted in economic loss, emotional distress and other harm for which they are entitled to compensation.

71.    Defendants have undertaken these discriminatory practices willfully or with reckless disregard for employees' rights under the New York State and New York City Human Rights laws.

72.     These employment practices violate and N.Y. Exec. Law §§ 290 *et seq*. and New York City Admin. Code § 8-107 et seq.

## CLASS-WIDE COUNT VI

### Violation of New York State and New York City Human Rights Statutes: Retaliation

73.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 72.

74.     Female officers and officer-equivalents opposed unlawful employment practices by informing Willis employees and managers that there were problems with unequal treatment of female employees, and by filing charges of discrimination with the EEOC. Such activities are protected under the New York City and New York State Human Rights Laws.

75.     Following such actions, employees have been demoted and terminated by Willis. These actions constitute retaliation in violation of N.Y. Exec. Law §§ 290 *et seq*. and New York City Admin. Code § 8-107 et seq.

76.     The defendants' discriminatory practices described above have caused employees harm, including economic loss and emotional distress.

77.     Defendants have undertaken these discriminatory practices willfully or with reckless disregard for employees' rights under the New York State and New York City Human Rights laws.

78.     Accordingly, the defendants violated employees' rights protected by N.Y. Exec. Law §§ 290 *et seq*. and New York City Admin. Code § 8-107 et seq.

19

## PLAINTIFF'S INDIVIDUAL CLAIMS

### INDIVIDUAL COUNT I

#### Violation of Title VII – Discriminatory Termination

79.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 78.

80.    Plaintiff was an experienced and qualified officer and manager of Willis's Environmental Practices department.  Despite her qualifications, she was demoted and terminated and replaced by a less qualified male employee at a higher salary.

81.    Upon information and belief, Plaintiff's termination was motivated in substantial part based on her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

### INDIVIDUAL COUNT II

#### Violation of New York State and City Human Rights Laws – Discriminatory Termination

82.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 81.

83.    Plaintiff was an experienced and qualified officer and manager of Willis's Environmental Practices department.  Despite her qualifications, she was demoted and terminated and replaced by a less qualified male employee at a higher salary.

84.    Upon information and belief, Plaintiff's termination was motivated in substantial part based on her gender, in violation of N.Y. Exec. Law §§ 290 *et seq.*, and New York City Admin. Code § 8-107.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff respectfully requests this Court:

A.      Declare that the practices described in this complaint exist at Willis and that they are unlawful;

B.      Issue a permanent injunction prohibiting the Defendants, their employees, agents, officers and successors, from engaging in the discriminatory employment practices complained of herein;

C.      Issue a permanent mandatory injunction requiring that Defendants adopt employment practices in conformity with the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, and the New York State and City Human Rights Laws;

D.      Award back pay and other job benefits sufficient to make Plaintiff whole;

E.      Award compensatory and punitive damages appropriate to the proof at trial;

F.      Award reasonable attorneys' fees and costs, including expert fees; and

G.      Order such other and further relief as the Court deems just and proper.

Dated: New York, New York
       December _18_, 2006.

Respectfully submitted,

BELDOCK, LEVINE & HOFFMAN LLP

_____
Robert L. Herbst (RLH8851)

BRILL & MEISEL
Rosalind Fink (RF2492)

Counsel for Plaintiff

21

*Index No.*                 *Year 20*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ADRIANNE CRONAS, on behalf of herself and all similarly situated persons,

                                      Plaintiffs,

        - against -

WILLIS GROUP HOLDINGS, LTD., WILLIS OF NORTH AMERICA INC., WILLIS OF NEW YORK, WILLIS OF NEW JERSEY, WILLIS OF MASSACHUSETTS,

                                   Defendants.

## COMPLAINT AND JURY TRIAL DEMAND

### BELDOCK LEVINE & HOFFMAN LLP

*Attorneys for*

Plaintiffs
99 PARK AVENUE
NEW YORK, N.Y. 10016-1503
(212) 490-0400

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*.............................................      Signature......................................................................................................

                              Print Signer's Name.......................................................................................

*Service of a copy of the within*                                      *is hereby admitted.*

*Dated:*

                                            *Attorney(s) for*

*Check Applicable Box*

*PLEASE TAKE NOTICE*

[ ] NOTICE OF ENTRY      *that the within is a (certified) true copy of a*
*entered in the office of the clerk of the within named Court on*               *20*

[ ] NOTICE OF SETTLEMENT      *that an Order of which the within is a true copy will be presented for settlement to the Hon.*              *one of the judges of the within named Court,*
*at*
*on*            *20*       *, at*              *M.*

*Dated:*

                                       **BELDOCK LEVINE & HOFFMAN LLP**

                   *Attorneys for*

                                         99 PARK AVENUE
                                       NEW YORK, N.Y. 10016-1503

*To:*